26CA0046 Peo in Interest of SMG 03-19-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 26CA0046
Pueblo County District Court No. 25MH30124
Honorable Amiel Markenson, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of S.M.G.,

Respondent-Appellant.

ORDER AFFIRMED

Division II
Opinion by JUDGE SULLIVAN
Fox and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 19, 2026

Cynthia Mitchell, County Attorney, Kate H. Shafer, Special Assistant County
Attorney, Pueblo, Colorado, for Petitioner-Appellee

Tezak Law, P.C., Mary Tezak, Florence, Colorado, for Respondent-Appellant

¶ 1     Respondent, S.M.G., appeals the district court's order authorizing the staff at the Colorado Mental Health Hospital in Pueblo (the hospital) to involuntarily medicate him.  We affirm.

## I.     Background

¶ 2     S.M.G. was committed to the hospital after being found incompetent to proceed in his criminal cases.  He was diagnosed with psychosis, not otherwise specified, and his symptoms included delusions, agitation, paranoia, and response to internal stimuli.  After S.M.G. was observed yelling and slamming things in the shower, the hospital staff began administering emergency medication.

¶ 3     At the request of S.M.G.'s treating physician, Dr. Hareesh Pillai, the People filed a petition to involuntarily medicate S.M.G. with olanzapine (also known as Zyprexa), haloperidol (also known as Haldol), and lithium.  The district court held an evidentiary hearing, at which Dr. Pillai and S.M.G. testified.  After hearing the evidence, the court found that the People had established all four elements for the involuntary administration of medication under *People v. Medina*, 705 P.2d 961, 973 (Colo. 1985), and granted the petition.

1

## II. Applicable Law and Standard of Review

¶ 4 A district court may order the involuntary administration of medication if the People prove by clear and convincing evidence that (1) the patient is incompetent to effectively participate in the treatment decision; (2) the treatment is necessary to prevent a significant and likely long-term deterioration in the patient's mental health condition or to prevent the likelihood of the patient causing serious harm to himself or others at the institution; (3) a less intrusive treatment alternative isn't available; and (4) the patient's need for treatment is sufficiently compelling to override any bona fide and legitimate interest of the patient in refusing treatment.[1] *Id.*

¶ 5 Application of the *Medina* test involves mixed questions of fact and law. *People v. Marquardt*, 2016 CO 4, ¶ 8. We defer to the district court's factual findings if they have record support and review its legal conclusions de novo. *Id.*

---

[1] A different test applies to petitions to administer involuntary medication solely to restore competency. *Sell v. United States*, 539 U.S. 166, 180-81 (2003). But the parties don't dispute that *People v. Medina*, 705 P.2d 961 (Colo. 1985), applies here because the purpose of the medications is to prevent S.M.G. from (1) suffering a significant and long-term deterioration in his mental condition and (2) causing serious harm to himself or others in the institution. *See Sell*, 539 U.S. at 181-83.

¶ 6     When a patient challenges the sufficiency of the evidence supporting an involuntary medication order, we must affirm if the evidence, viewed as a whole and in the light most favorable to the People, is sufficient to support the order.  *People in Interest of R.K.L.*, 2016 COA 84, ¶ 13.  As the fact finder, the district court determines the sufficiency, probative effect, and weight of the evidence, along with the inferences and conclusions to be drawn from the evidence.  *People in Interest of R.C.*, 2019 COA 99M, ¶ 7.

### III.   Analysis

¶ 7     S.M.G. contends only that the evidence was insufficient to prove the fourth *Medina* element.  We disagree.

¶ 8     In assessing this element, a court must first determine "whether the patient's refusal is bona fide and legitimate."  *Medina*, 705 P.2d at 974.  If so, the court must then determine "whether the prognosis without treatment is so unfavorable that the patient's personal preference must yield to the legitimate interests of the state in preserving the life and health of the patient placed in its charge and in protecting the safety of those in the institution."  *Id.*

¶ 9     After considering the evidence, the district court determined that S.M.G.'s need for treatment was sufficiently compelling to

override any bona fide and legitimate interests that he had in refusing medication. In so finding, the court described some of S.M.G.'s objections to the medication, including (1) side effects such as hair loss, weight gain, and cramping; (2) health concerns such as neuropathy, blood sugar levels, and a heart condition; and (3) his religious beliefs. The court noted that none of the side effects or health conditions posed any significant risks at that time and that the hospital would continue to monitor them. As for S.M.G.'s religious objections, the court found that S.M.G. had "religious beliefs and concerns with taking medication," but the specific nature of S.M.G.'s religious objection was "a little unclear." As we read the court's order, the court assumed for the purpose of its analysis that S.M.G.'s religious objections were bona fide and legitimate.

¶ 10 Even so, the district court found that the state's legitimate interests in preserving S.M.G.'s life and health and protecting the safety of others in the institution outweighed his reasons for refusing medication. In reaching this conclusion, the court pointed to S.M.G.'s "dangerousness." Among other things, the court noted that S.M.G. had assaulted a cellmate while in the jail and had

4

"admit[ted] to swinging at staff and spitting on staff" during his stay at the hospital.

¶ 11    The record supports the district court's findings.  Dr. Pillai testified that S.M.G.'s refusal to take medication was irrational and unreasonable under the circumstances.  Dr. Pillai acknowledged that side effects from the medications could qualify as a bona fide and legitimate reason to refuse medication, but he noted that S.M.G. hadn't experienced any "severe side effects" and, in any event, he was skeptical that some of S.M.G.'s complaints were "based in reality."  As to the health issues, Dr. Pillai testified that (1) S.M.G.'s blood sugar levels were normal; (2) there was no evidence of neuropathy; and (3) although S.M.G. had bradycardia, it didn't "seem to be affecting him," he previously "did well" on the medications despite his bradycardia, and he didn't "need active intervention."

¶ 12    During his testimony, S.M.G. described himself as a "very religious person" and said that his religion is a "big part of [his] life."  He also felt "insult[ed]" when told that his "delusions are interfering with reality" because that is "literally what prayer is."  He said that the medications "greatly diminished" his ability to "connect[] with

5

God" because they cause "psychological dullness." S.M.G. didn't testify, however, that his religious beliefs prohibited him from taking the medications.

¶ 13    Dr. Pillai opined that, even considering these issues, S.M.G.'s need for medication still outweighed any risk. As Dr. Pillai explained, when medicated, S.M.G.'s condition improved and the only significant side effect he reported — cramping — was alleviated by switching his mood stabilizer from Depakote to lithium. Dr. Pillai also testified that, without medications, S.M.G. would continue to deteriorate and pose a significant risk of harm to others. In support, Dr. Pillai pointed to S.M.G.'s history of previous hospitalization and his presentation during his current hospital stay. Specifically, Dr. Pillai discussed two previous incidents during which S.M.G. assaulted other individuals because he believed they were "interrupting his sleep via telepathy." Dr. Pillai also said that, during his current hospitalization, S.M.G. "incite[d] an incident" with another patient and punched a nurse.

¶ 14    On appeal, S.M.G. recounts the evidence supporting the district court's finding that he had a bona fide and legitimate reason for refusing medication. But S.M.G. doesn't challenge the evidence

establishing that his prognosis without treatment was so unfavorable that his preference against medication must yield to the state's interests in preserving his life and health and protecting the safety of those in the hospital. The district court weighed this evidence and determined that S.M.G.'s preference had to yield to the state's interests. We can't reweigh the evidence to reach a different result. *See People in Interest of Uwayezuk*, 2023 COA 69, ¶ 57 (noting that, if ample evidence supports the decision, a reviewing court can't substitute its judgment for that of the district court).

¶ 15 Accordingly, viewing the evidence in the light most favorable to the People, we conclude that sufficient evidence supported the district court's determination that S.M.G.'s personal preference to refuse medication must yield to the state's legitimate interests in protecting his health and others in the hospital. *See id.*; *see also R.K.L.*, ¶ 13 ("The testimony of the physician seeking to administer treatment may be sufficient by itself to satisfy" the *Medina* elements.).

## IV. Disposition

¶ 16 We affirm the order.

JUDGE FOX and JUDGE KUHN concur.